IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LYNDSEY L. HUMBERSON, | ) | CASE NO. 1:15CV106 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Lyndsey L. Humberson ("Humberson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 16.

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to adhere to the treating physician rule when rendering his decision in that he did not articulate reasons for discounting the opinion of Humberson's treating physician that are sufficiently specific to afford an adequate basis for review. Accordingly, the Commissioner's decision is **REVERSED and REMANDED** .

**I. Procedural History**

Humberson filed an application for SSI and Disability Insurance Benefits ("DIB") on July 6, 2012, alleging a disability onset date of January 1, 2006. Tr. 15, 189, 191, 217. She alleged disability based on the following: posttraumatic stress disorder; major depressive

1

disorder; anxiety; sleep disorder; and severed radial nerve on left forearm due to injury. Tr. 221. After denials by the state agency initially (Tr. 85, 86) and on reconsideration (Tr. 112, 113), Humberson requested an administrative hearing. Tr. 158. A hearing was held before Administrative Law Judge ("ALJ") Eric Westly on June 5, 2013. Tr. 34-73. At the hearing, Humberson amended her alleged onset date to the date she filed her application and dropped her appeal of her DIB claim. Tr. 38. In his June 27, 2014, decision (Tr. 15-27), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Humberson can perform, i.e., she is not disabled. Tr. 26. Humberson requested review of the ALJ's decision by the Appeals Council (Tr. 10) and, on November 26, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Humberson was born in 1982 and was 29 years old on the date her application was filed. Tr. 217. She graduated from high school in 2001 and completed cosmetology training in 2002. Tr. 222. She previously worked in a salon as a hair stylist and as a home health aide. Tr. 222. She also cleaned hotel rooms. Tr. 47. She last worked in 2012. Tr. 222.

### B. Relevant Medical Evidence

**Mental:** On December 23, 2008, Humberson saw Kathryn S. Muzina, M.D., for a psychiatric evaluation. Tr. 547-551. Humberson complained of depression and anxiety. Tr. 550. She reported panic attacks several times a week lasting 30-60 minutes. Tr. 550. She had suffered attacks since childhood but, recently, they were becoming more frequent and more severe. Tr. 550. She also had insomnia, a poor appetite, and weight loss. Tr. 550. She had begun to avoid public places for fear of having a panic attack and complained of anhedonia,

2

anergia, and some difficulties with memory and concentration. Tr. 550. Upon examination, her mood was mildly anxious and her affect mildly constricted. Tr. 550. Her concentration and memory were intact, her insight and judgment good, and she was pleasant and cooperative with good eye contact, normal speech, and a logical thought process. Tr. 550. Dr. Muzina diagnosed her with panic disorder with agoraphobia and depression, not otherwise specified. Tr. 551. She assessed a Global Assessment of Functioning ("GAF") score of 51-60.[1] Tr. 551. She prescribed Xanax and Paxil. Tr. 551.

On January 12, 2009, Humberson saw Dr. Muzina again; she reported feeling better and sleeping better. Tr. 551. Dr. Muzina observed the same examination findings as her previous visit. Tr. 551. On March 5, 2009, Humberson reported to Dr. Muzina that she was doing well and that her mild anxiety responded well to the Xanax. Tr. 552.

From December 2010 to August 2011, Humberson saw Thomas Svete, M.D., for management of her medications. Tr. 707, 705, 703, 701, 700.

On April 13, 2011, Humberson was admitted to the hospital after suffering a deep laceration on her left arm from a knife, distal to her left antecubital fossa. Tr. 280. She reported that she was having an argument with a family member when she accidentally lost control of the knife. Tr. 280. She initially had wrist drop and numbness in her hand between her thumb and index finger and was presumed to have radial nerve damage. Tr. 325.

On April 15, 2011, Humberson underwent complex wound repair surgery, "including the muscles of the mobile wide and skin" and repair of her radial nerve in her left forearm. Tr. 265. On May 26, 2011, she reported no pain, had a full range of motion in her elbow, and was

---

[1] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

3

performing her occupational therapy.  Tr. 265.   She noted no identifiable return of motor function or sensory function. Tr. 265.  She had a positive Tinel's sign distal to the scar over the radial nerve, no

active radial nerve function, and no radial nerve distribution.  Tr. 265.

In May 2011, Humberson was evaluated at the Lake County Sheriff's Office after being incarcerated on a charge of driving under the influence.  Tr. 371, 373.  She reported that her injury in April 2011 was a suicide attempt.  Tr. 371.  On May 14, 2011, she expressed suicidal comments and was placed on suicide precautions.  Tr. 371.  She was also placed in isolation because of her recent surgery and reported having a hard time being in isolation.  Tr. 373.  She was diagnosed with depression, anxiety, alcohol dependence, and a rule out for bipolar disorder.  Tr. 375.  She was prescribed medication and released from jail on June 28, 2011.  Tr. 368.

On October 28, 2011, Humberson visited Pathways for an Adult Diagnostic Assessment for treatment of depression, anxiety with panic attacks, sleep disturbance, appetite disturbance, and cognitive issues.  Tr. 471.  She admitted that she last took her medication in August 2011 and that she had not been taking her medication "enough" or as directed.  Tr. 471.  She stated that she did not want to be on medication but that she now felt that she needed it.  Tr. 479.  She reported decreased activities of daily living, decreased performance of household chores, and decreased motivation caused by lack of sleep and depression.  Tr. 472.  Humberson returned for an Initial Psychiatric Evaluation on November 2, 2011, and was diagnosed with posttraumatic stress disorder and depressive disorder and assigned a GAF score of 45.[2]  Tr. 511.

On November 15, 2011, Humberson was admitted to Windsor-Laurelwood Center for Behavioral Medicine due to feeling acutely suicidal.  Tr.  380.  She reported that she had not

---

[2]  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR, at 34.

been taking her medications. Tr. 380. She was re-prescribed Celexa, Ambien, and Xanax, and attended group therapy. Tr. 380. She was discharged on November 22, 2011, with a GAF score of 60. Tr. 381.

On September 20, 2012, Humberson saw Dr. Muzina for medication management and to request a change in her antidepressant. Tr. 547. She complained of increased symptoms of anxiety and depression since November 2011 and cited a number of recent stressors, including financial strain, a finalization of her divorce and problems with her ex-husband, an ex-boyfriend's serious medical condition, and having had an abortion. Tr. 547. Humberson denied symptoms of attention deficit hyperactivity disorder ("ADHD"). Tr. 548. She complained of feeling "keyed up," having fatigue, irritability, trouble concentrating, sleep disturbance, and panic attacks. Tr. 547. Upon examination, Humberson had a depressed mood and constricted affect. Tr. 549. Her insight was adequate, judgment good, and she had good eye contact, normal speech, and was cooperative. Tr. 549. Dr. Muzina diagnosed her with panic disorder, depressive disorder, and rule out bipolar affective disorder. Tr. 549. She assessed a GAF score of 51-60 and prescribed Cymbalta. Tr. 549.

On November 29, 2012, Humberson reported to Dr. Muzina that she had no significant change since her last visit and was not "clearly responding" to Cymbalta. Tr. 555. Dr. Muzina increased her dosage of Cymbalta. Tr. 556.

On February 7, 2013, Dr. Muzina noted that Humberson had stopped taking Cymbalta weeks prior for "unclear reasons—does say that she doesn't want to be on medications forever." Tr. 559. Humberson complained of increased anxiety and depression, reduced frustration tolerance, and mood lability. Tr. 559. She had recently dyed her hair brown after being blonde for years. Tr. 559. She told Dr. Muzina that she was moving to Arizona with her boyfriend and

5

that they planned to leave that weekend.  Tr. 559.  She explained that her boyfriend has family there, including someone who was ill and required help with care, and that she "needs to get away from all the negativity in the Cleveland area."  Tr. 559.  Dr. Muzina advised that she follow-up with a psychiatrist in Arizona as soon as possible.  Tr. 560.

On August 15, 2013, Humberson saw Dr. Muzina again after returning from Arizona.  Tr. 580.  She had not followed up with treatment in Arizona and had been off her medications for 6-8 months.  Tr. 580.  She reported that she was in Arizona for six months and left after having been raped.  Tr. 580.  She stated that being home had only increased her stress level because she was staying with her mother with whom she did not get on well.  Tr. 580.  She advised that she hoped to return to Arizona in a few weeks.  Tr. 580.  She complained of increased symptoms of anxiety and depression since the assault.  Tr. 580.  She had been working a part-time job in Arizona and wanted to get back to it.  Tr. 581.  Upon examination, Dr. Muzina observed that Humberson's concentration was scattered, her mood was anxious/depressed, and her affect was restricted.  Tr. 581.  Dr. Muzina diagnosed her with adjustment disorder with mixed anxiety and depressed mood; panic disorder, without agoraphobia; acute posttraumatic stress disorder; and depressive disorder.  Tr. 581.

Humberson saw Dr. Muzina again on September 25, 2013, reporting that she was leaving the next day to move to Oregon and had a job lined up as a caregiver.  Tr. 660.  She complained of struggling with poor concentration and distractibility.  Tr. 660.  She stated that she had been taking her medications but was not sure that they had "kicked in."  Tr. 660.  She was sleeping better with Ambien.  Tr. 660.  Dr. Muzina mentioned a trial of a stimulant to treat Humberson's previously diagnosed ADHD but Dr. Muzina was uncomfortable starting a stimulant if

6

Humberson was leaving town the next day. Tr. 660-661. Dr. Muzina suggesting increasing Humberson's Cymbalta dosage but Humberson was hesitant. Tr. 661.

On October 29, 2013, Humberson saw Dr. Muzina again. Tr. 656. She reported that she went to Oregon but that the job there did not work out. Tr. 656. She indicated that she was interested in trying a stimulant. Tr. 656. Her mood was dysphoric and anxious and her affect was mood-congruent and appropriate to topic. Tr. 657. Dr. Muzina prescribed Adderall. Tr. 657.

On January 22, 2014, Humberson returned to Dr. Muzina reporting that she did well on Adderall but that she was no longer on Medicaid and lost her prescription benefits. Tr. 696. She was no longer living with her mother; she had moved in with her boyfriend. Tr. 969. On March 17, 2014, Humberson told Dr. Murzina that she was pregnant and that her pregnancy was going well. Tr. 709. Due to her pregnancy, she was no longer taking Xanax but requested medication for her ADHD. Tr. 709. Upon examination, her concentration was normal, her mood was mildly anxious, and her affect was full and appropriate to topic. Tr. 709. She was excited about her pregnancy and was feeling well physically. Tr. 710. Dr. Murzina assessed a GAF score of 61-70.[3] Tr. 710.

**Physical:** After surgery on her left arm, Humberson saw Charmaine Gutjarh, M.D., on March 31, 2012, complaining of left arm pain. Tr. 516. She had a fair grip with her left hand and impaired thumb extension. Tr. 516. Dr. Gutjarh assessed her with chronic pain and possible reflex sympathetic dystrophy. Tr. 516. She prescribed an increased dosage of Neurontin and trial Toradol injection. Tr. 516.

---

[3] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR, at 34.

7

On April 25, 2012, Humberson went for an initial evaluation for occupational therapy. Tr. 539.  She reported that her pain was worse in cold and wet weather and that she had been undergoing pain management and had received her first epidural injection.  Tr. 539.  She did not have pain at the time of her visit, but complained of some pain at varying levels when performing tasks such as heavy lifting and repetitive activities such as styling hair.  Tr. 540. Upon examination, she had increased pain,  decreased radial abduction and palmer abduction of her right thumb, and her left arm and hand were mildly atrophied compared to the right. Tr. 540. She held her left arm next to her body in a mildly guarded/protected position.  Tr. 540.  Left hand strength and pinch strength were impaired.  Tr. 540.

On September 12, 2012, Humberson complained of persistent left arm pain, painful to light touch at times.  Tr. 575.  Upon examination, her left arm showed muscular weakness, muscle atrophy, decreased sensation to light touch from her scar line down to her fingertips, and decreased left grip strength.  Tr. 576.

On January 22, 2013, Humberson saw pain management physician Fady Nageeb, M.D., complaining of consistent left arm pain, burning, 10/10.  Tr. 589.  Her Percocet was helping but was only lasting four hours.  Tr. 590.  Upon examination, she had mild to moderate tenderness over her left hand.  Tr. 589.  Dr. Nageeb increased Humberson's Percocet and referred her for a neurological consultation.  Tr. 590.

On August 7, 2013, Humberson returned to Dr. Nageeb with the same complaints of arm pain in addition to back and knee pain.  Tr. 601.   Upon examination, palpation revealed allodynia of her left thumb and wrist.  Tr. 602.  Dr. Nageeb prescribed Oxycodone, Alprazolam, and a Fentanyl transdermal patch.  Tr. 602.  Humberson returned for a follow-up on August 27 with the same arm complaints; Dr. Nageeb increased her Lyrica.  Tr. 687.

8

On March 20, 2013, Humberson went to Rehab Arizona for an initial pain management and rehabilitation evaluation.  Tr. 638.  Her pain level was 6/10.  Tr. 638.  Upon examination, she had 4/5 motor strength in her left biceps, triceps, wrist extensors, grip, and hand intrinsics.  Tr. 630.  She displayed diminished sensation to pinprick in her left forearm and hand, pain to palpation generally below her left elbow, and a limited range of motion in her left wrist secondary to pain and weakness.  Tr. 630. She was diagnosed with causalgia of upper limb, mononeuritis arm unspecified, injury to radial nerve, and pain in limb.  Tr. 630.  She was prescribed Oxycodone and MS Contin.  Tr. 631.

On May 29, 2013, Humberson complained of pain in her arm that had been worse than usual and stated that she felt she was under-medicating herself.  Tr. 616.  She received a radial nerve block on her left arm.  Tr. 619.  She returned on June 26 reporting that the radial nerve block did not help her pain.  Tr. 612.

On October 18, 2013, Humberson saw Emad Mikhail, M.D.  Tr. 669-674.  She complained of pain in her left arm, right knee, and neck.  Tr. 669.  She described her left arm pain as numbness, burning, and pins and needles and described aggravating factors as prolonged keyboard activity, repetitive grasping, repetitive lifting, and left wrist flexion, extension, grip, pincer grip, and finger opposition. Tr. 669.  She could not work or perform chores, and reported limitations in bathing, dressing, housekeeping, lifting or carrying, preparing meals, and shopping.  Tr. 671.  Upon examination, she had, in her left arm: tenderness; a positive resistive tennis elbow test; moderate allodynia in her forearm and hand; moderate trophic changes in her forearm; mild coldness; and mild hand erythema.  Tr. 673.  Dr. Mikhail assessed chronic pain syndrome and reflex sympathetic dystrophy of upper limb.  Tr. 674.

**D.  Medical Opinion Evidence**

**1. Treating Source Opinion**

On January 30, 2013, Dr. Muzina completed a questionnaire regarding Humberson.  Tr. 544-546.  She indicated she first saw Humberson on September 18, 2012, and last saw her on November 29, 2012, and summarized her findings.  Tr. 545-546.  When asked to describe limitations that Humberson's impairments imposed on her ability to perform sustained work activity, Dr. Muzina wrote, "concentration is impaired[;] frustration tolerance is very low[; and] her physical symptoms interfere with her ability to take care of her personal needs/function independently."  Tr. 546.

On August 26, 2013, Dr. Muzina completed a Mental Assessment of Ability to do Work-Related Activities on Humberson's behalf.  Tr. 585-586.  Dr. Muzina opined that Humberson had extreme limitations in her ability to maintain concentration and attention for extended periods and in her ability to respond to customary work pressures; marked limitations in ten other areas identified on the form; and moderate limitations in three areas—use good judgment, follow simple instructions, and estimated degree of deterioration in personal habits.  Tr. 585-586.  She would be absent more than three times a month.  Tr. 586.

**2. State Agency Reviewers**

On October 15, 2012, state agency reviewing psychologist Caroline Lewin, Ph.D., reviewed Humberson's file.  Tr. 91, 95-96.  Dr. Lewin opined that, due to Humberson's anxiety and depression, she was capable of maintaining attention and concentration for tasks that are simple and routine in nature; can cope with ordinary and routine changes in a work setting that are not fast paced or of high demand; is limited to infrequent contact with the general public and can interact occasionally and superficially and receive instructions and ask questions appropriately in a work setting; can interact occasionally in situations that do not require

resolving conflict or persuading others to follow demands; and is limited to job duties that are static in nature. Tr. 96.

On February 19, 2013, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed Humberson's file and affirmed Dr. Lewin's opinion. Tr. 124-125.

E. Testimonial Evidence

1. Humberson's Testimony

Humberson was represented by counsel and testified at the administrative hearings. Tr. 36-67. She was 23 weeks pregnant at the time of the hearing. Tr. 42. She lives with her mother at her mother's house and is not currently working. Tr. 42. She was receiving spousal support from a previous marriage but it had run out. Tr. 42.

Previously she worked at salons as a hairdresser. Tr. 42-43. Her hairdressing license is currently inactive. Tr. 42. She worked at a number of salons because she had a hard time keeping focused and staying in one place for an extended period of time and would quit because she felt inadequate compared to her coworkers. Tr. 43-44. She never had problems at work and got along great with her coworkers. Tr. 44. After her injury to her arm, she tried working in home healthcare but she was unable to lift people as required. Tr. 45-46. She quit because of the physical aspect of that job and had no other problems other than she worked the third shift and had issues with sleep. Tr. 46. In Arizona, she worked in the food industry serving and bartending but could not lift the trays and kegs. Tr. 49-50.

Humberson stated that she has battled with depression, anxiety, and ADHD her whole life. Tr. 51. The biggest factor in her ability to work is her arm; a "huge contributing factor as to why I can't stick with something" is her ADHD. Tr. 51. She has been on Adderall for three months. Tr. 52. It helps her focus but she feels like it needs some adjusting because she still has

11

a hard time.  Tr. 52.  She will start a project at home and not finish it.  Tr. 53.  When asked how she ever completed a head of hair, she explained, "I would complete whatever I had on my book, and then I would say I got sick or something, and leave."  Tr. 53.  She enjoyed working with hair but can no longer do so because she lacks the manual dexterity in her left hand and fingers.  Tr. 54.  Her pointer finger and her thumb do not extend beyond a certain position.  Tr. 39, 59.

    She has good days and bad days with her arm.  Tr. 55.  On a bad day "its dropping me down to my knees and, you know, it's completely debilitating."  Tr. 55.  Currently, she is unable to take her pain medications because she is pregnant.  Tr. 40.  Thus, she tries to do everything with her right hand.  Tr. 40.  Without her medication she has flare-ups ten times a month.  Tr. 55.  She previously was able to control the flare-ups with pain medication and would have flare-ups three to four times a month.  Tr. 56.  She would take her medication "as needed" but she was taking it almost every day when she would feel "it just coming on slightly."  Tr. 57.

    Humberson testified that she has problems getting dressed, such as doing up buttons.  Tr. 59.  When she washes her hair she tries to use her right hand as much as possible.  Tr. 59.  She cannot cut food to cook because she is unable to grasp the food hard enough with her left hand.  Tr. 60.  She no longer drives because she does not have a license and does not believe "it's very smart to drive" while taking medication for anxiety and pain.  Tr. 61.  She previously was able to drive using one hand.  Tr. 61.

    **2.  Vocational Expert's Testimony**

    Vocational Expert Deborah Lee ("VE") testified at the hearing.  Tr. 61-72.  The ALJ discussed with the VE Humberson's past work as a hair stylist, home health aide, and cleaner.  Tr. 62-63.  The ALJ asked the VE to determine whether a hypothetical individual with Humberson's work experience could perform her past work if that person had the following

12

characteristics: can lift/carry 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours in an eight-hour workday; sit six hours in an eight-hour workday; can occasionally handle and finger, but never operate hand controls with her left hand; can never climb ladders, ropes, or scaffolds; can frequently reach in all directions with her left upper extremity; must avoid all exposure to hazards; can perform simple tasks in a setting with no fast pace, no strict production demands, and no more than infrequent changes; and can occasionally, i.e. rarely, interact with supervisors and co-workers and infrequently interact with the public, if the interaction with everyone is limited to speaking and signaling.  Tr. 63-64.  The VE answered that such an individual could not perform Humberson's past relevant work as a hair stylist or home health aide, but could perform work as a cleaner/housekeeper.  Tr. 66.  The ALJ asked if there were other jobs the hypothetical individual could perform, and the VE replied that such an individual could perform work as a mail clerk (1,000 northeast Ohio jobs; 3,000 Ohio jobs; 68,800 national jobs).  Tr. 67-68.  The ALJ asked the VE if the hypothetical individual could perform the job of bakery worker, conveyor line.  Tr. 68.  The VE discussed with the ALJ the requirements of bakery worker, conveyor line and concluded that the hypothetical individual could perform this job.  Tr. 69.  The ALJ asked the VE if the hypothetical individual could perform the job of counter clerk.  Tr. 69.  The VE stated that the job of counter clerk is obsolete and that she does not see it often.  Tr. 69-70.  The ALJ asked about a counter clerk for radio or television broadcasts and the VE answered that the hypothetical individual could not perform that job.  Tr. 70.

Next, the ALJ asked the VE whether her answer would change if the hypothetical individual described was further limited to no handling and fingering with the left hand.  Tr. 71.

The VE answered that the previously identified jobs of cleaner and mail clerk would not be available and that no other jobs would be available. Tr. 71.

Humberson's attorney asked the VE whether the hypothetical individual could perform work if she would be absent more than three times a month or off task more than 20% of the time. Tr. 72. The VE stated that there would be no work for such an individual. Tr. 72.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.       If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.       If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also* *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his June 27, 2014, decision, the ALJ made the following findings:

1.       The claimant met the insured status requirements of the Social Security Act through December 31, 2006.  Tr. 17.

2.       The claimant has not engaged in substantial gainful activity since August 13, 2012, the alleged onset date.  Tr. 18.

3.       The claimant has the following severe impairments: other and unspecified arthropathies (left arm nerve damage, right knee pain), affective disorders, and anxiety.  Tr. 18.

4.       The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 18.

5.       The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), limited to lifting or carrying 20 pounds

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

      occasionally and 10 pounds frequently; standing or walking 6 hours out of 8; sit 6 hours out of 8; further limited to occasional handling and fingering but precluded from the operation of hand controls with the left hand; precluded from climbing ladders, ropes or scaffolds; limited to frequent reaching in all directions with the left upper extremity; precluded from all exposure to hazards; with the ability to perform simple tasks in a setting with no fast pace, no strict production demands, and no more than infrequent changes; limited to occasional interaction with supervisors and coworkers and infrequent interaction with the public if that interaction is limited to speaking and signaling. Tr. 20.

6.     The claimant is capable of performing past relevant work as a cleaner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. Tr. 26.

7.     The claimant has not been under a disability, as defined in the Social Security Act, from August 13, 2012, through the date of this decision. Tr. 26.

## V. Parties' Arguments

Humberson objects to the ALJ's decision on two grounds. She argues that the ALJ did not follow the treating physician rule when considering the opinion of Humberson's treating psychiatrist, Dr. Muzina, and that the ALJ's finding that Humberson was not entirely credible was not supported by substantial evidence. Doc. 17, p. 18. In response, the Commissioner submits that substantial evidence supports the ALJ's decision with respect to Dr. Muzina's opinion and Humberson's credibility. Doc. 19, pp. 7-11.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

16

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not follow the treating physician rule

Humberson argues that the ALJ failing to follow the treating physician rule when she evaluated the opinion of her treating psychiatrist, Dr. Muzina.  Doc. 17, p. 19.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  See 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 747 (6th Cir. 2007).

With respect to Dr. Muzina's opinion, the ALJ referred to the August 2013 mental assessment form completed by Dr. Muzina.  Tr. 22.  He recited the thirteen "marked" and "extreme" limitations assessed by Dr. Muzina.  Tr. 22.  He noted Dr. Muzina's diagnoses and her

17

belief that Humberson's limitations would cause Humberson to be absent from work more than three times per month. Tr. 22.  The ALJ concluded,

> The undersigned gives some weight to this assessment.  However, it is not supported by the evidence.  The record does not support the marked and extreme limitations suggested by Dr. Muzina.

Tr. 22.

The ALJ failed to comply with the treating physician rule.  The sole reason he offered for giving Dr. Muzina's opinion less than controlling weight, that it is "not supported by the evidence," without citing any evidence, is not sufficiently specific to make clear to any subsequent reviewer the weight given to the opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544; *Friend v. Comm'r of Soc. Sec*., 375 Fed. App'x 543, 551 (6th Cir. 2010) ("while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule.").  In the only other portion of the ALJ's decision that appears to be a relevant analysis of Humberson's mental limitations, the ALJ states, without citing to the record, that Humberson's mental impairments "appear to be relatively well controlled with medication and treatment."  Tr. 24.  He observes that the record "indicate[s] a period of even being off her medications 6-8 months."  Tr. 24.  He notes that Humberson "is capable of dating, making an out of state move, and making a return move."  Tr. 24.  The aforesaid, however, do not make clear to the Court what portion of Dr. Muzina's opinion the ALJ gave "some" weight to and his reasons for doing so.  *See* 20 C.F.R. § 416.927(c)(2)(the ALJ considers the length of the treatment relationship and the nature and extent of that relationship; the supportability and consistency of the opinion; the specialization of the physician; and other factors).

Tellingly, the Commissioner does not take the position that the ALJ complied with the treating physician rule.  Instead, the Commissioner cites to evidence in the record that, she argues, supports the ALJ's decision.  Doc. 19, pp. 8-9 (citing to the following: at the time Dr. Muzina rendered her opinion she had only seen Humberson once in the past six months; there were inconsistent reports by Humberson to Muzina about her medication use; mistaken notes in Dr. Muzina's records regarding Humberson's history; Dr. Muzina's opinion was a "check-mark" form with no narratives; and that extreme and marked limitations were inconsistent with Humberson's activities of moving out of state twice and back again and working two jobs in Arizona and finding a job in Oregon prior to moving there).  However, such post-hoc rationalizing is not permitted by the court on review.  See *S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) (a reviewing court must judge the propriety of agency action "solely by the grounds invoked by the agency").  Because the ALJ did not explain his reasons for giving only "some" weight to Dr. Muzina's opinion, his decision runs afoul of the treating physician rule and must, therefore, be reversed.  See *Wilson*, 378 F.3d at 544 (reversal required when the agency fails to follow its procedure, even if substantial evidence otherwise supports the ALJ's decision).

### B. On remand, the ALJ will have an opportunity to reevaluate Humberson's credibility

Humberson asserts that the ALJ's credibility determination is not supported by substantial evidence.  Doc. 17, p. 21.  Again, the Commissioner does not discuss the ALJ's decision but, instead, identifies evidence in the record that she believes supports the ALJ's finding that Humberson's allegations of extreme limitations are not fully credible.  The Court does not address Humberson's credibility argument because, on remand, the ALJ's evaluation of Dr. Muzina's opinion may impact and clarify his findings with respect to Humberson's credibility.  Regarding physical limitations, the Court notes that the ALJ's reasons for finding

19

Humberson's left arm impairments not as severe as alleged—that Humberson became pregnant, dyed her hair once, and reported doing regular cardio-vascular exercises—are not persuasive in that they do not, on their face, indicate that Humberson can use her left hand for handling and fingering.[5]  Tr. 25.  On remand, the Commissioner will have an opportunity to consider Humberson's credibility regarding her mental and physical limitations further.  *See Gresham v. Comm'r of Soc. Sec.*, 2014 WL 3749375, at *11 (N.D.Ohio July 30, 2014) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's determination might impact her findings).

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.

Dated: November 6, 2015

Kathleen B. Burke
United States Magistrate Judge

---

[5] For example, all cardio-vascular exercise does not require the ability to use the left arm.  Nor does dying one's hair; assuming that Humberson dyed her own hair, she could have done so using her right hand in the same manner she washes her hair, as she testified (*see* Tr. 59, "when I shampoo and condition my hair, I try to just use my right hand as much as possible.").